[Cite as *Cleveland v. Dickerson*, 2016-Ohio-806.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 101782 and 101783**

**CITY OF CLEVELAND**

PLAINTIFF-APPELLEE

vs.

**NEDRA DICKERSON, ET AL.**

DEFENDANTS-APPELLANTS

**DECISION EN BANC:**
AFFIRMED

Criminal Appeal from the
Cleveland Municipal Court
Case Nos. 2014 CRB 005203 and 2014 CRB 005201

**BEFORE:** The En Banc Court

**RELEASED AND JOURNALIZED:** March 3, 2016

**ATTORNEYS FOR APPELLANTS**

**For Nedra Dickerson**

Anna Markovich
Law Office of Anna Markovich
The Palm Aire Building
18975 Villaview Road, Suite 3
Cleveland, Ohio 44119

**For Aaron Hendon**

Susan J. Moran
55 Public Square, Suite 1616
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
Law Director
City of Cleveland

BY:    Bryan Fritz
       Victor R. Perez
Assistant City Prosecutors
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1}   Pursuant to App.R. 26, Loc.App.R. 26, and *McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, this court determined that a conflict existed between the proposed majority panel decisions in these two cases and agreed to hear these matters en banc.   The cases were consolidated for en banc review.

{¶2}   In this consolidated appeal, defendants-appellants, Nedra Dickerson (individually "Dickerson") and Aaron Hendon (individually "Hendon") (collectively "appellants"), appeal the judgment of the Cleveland Municipal Court finding them guilty of criminal trespass. Appellants argue their criminal trespass conviction is supported by insufficient evidence and is against the manifest weight of the evidence.   Additionally, Dickerson contends that the trial court abused its discretion in imposing as a condition of probation that she have no contact with the airport, unless she is there for a "lawful reason."

{¶3} After careful review of the record and relevant case law, we affirm.

## I.   Procedural and Factual History

{¶4} In March 2014, Dickerson and her then nineteen-year old son, Hendon, were cited for criminal trespass in violation of Cleveland Codified Ordinances ("CCO") 623.04, a misdemeanor of the fourth degree.   In July 2014, the case proceeded to a bench trial.

{¶5} At trial, Officer DiMarco of the Cleveland police testified that he was on duty at Cleveland Hopkins International Airport ("Hopkins Airport") in March 2014, when he observed Dickerson in the baggage claim area speaking with Officer Harper.   Following a brief discussion, Officers DiMarco and Harper advised Dickerson that she could not loiter in the airport.   Officer DiMarco testified that he had warned Dickerson not to loiter in the past and that she often became "argumentative."   On this occasion, Dickerson responded that she was not

loitering but was waiting for her son to return from the restroom. Officer DiMarco testified that he walked to the nearest men's restroom to determine if Hendon was inside. However, before Officer DiMarco could enter the restroom, Hendon walked out and rejoined his mother in the baggage claim area.

{¶6} Officer DiMarco testified that the situation did not conclude once he and Hendon returned to the area where Dickerson was standing. At that time, Officer DiMarco advised Dickerson for a second time that she could not loiter and would have to leave the airport. According to Officer DiMarco, Dickerson stated, "I don't know who you people are, I don't have to leave here. I'm not loitering, I'm not going to leave." As Dickerson's conduct became more disruptive, Sergeant DeJesus approached the situation and advised Dickerson and Hendon that he was Officer DiMarco's supervisor and that they could be arrested for criminal trespassing if they did not leave the premises. Officer DiMarco testified that Dickerson refused to leave, stating, "Arrest me. Arrest me. I'm not leaving." Dickerson was arrested at that time.

{¶7} Officer DiMarco testified that he then turned to Hendon, who was standing next to Dickerson, and advised him that he would have to leave the airport or be arrested for criminal trespass. Officer DiMarco testified that Hendon stated that he was not leaving and "was going to jail."

{¶8} Dickerson testified that she and her son are homeless. She stated that they took public transportation to Hopkins Airport to use its restroom facilities. Contrary to Officer DiMarco's testimony, Dickerson testified that the officers never warned her that she could not loiter and never asked her to leave the airport. Instead, Dickerson insisted that her disagreement with the officers stemmed from Officer Harper's failure to produce his name and badge number and his disbelief that Dickerson was waiting for her son to use the restroom.

{¶9} Hendon also testified that he and his mother took public transportation to Hopkins Airport to use the restroom. In addition, Hendon stated that the officers never asked them to leave the airport. However, Hendon admitted that Officer DiMarco warned him and his mother that they could not loiter in the airport. Hendon explained that although the officers advised him that he was free to leave the premises, he did not leave the airport because he did not want to leave his mother's side.

{¶10} At the conclusion of trial, the trial court found Dickerson and Hendon guilty of criminal trespassing. Appellants were each sentenced to a $250 fine and 30 days in jail. The court gave them credit for the two days they served, suspended the remaining 28 days of the sentence, and suspended the $250 fine. Additionally, the court placed appellants on "active probation" for a period of nine months so that the probation department could assist with housing or any other social services they needed. Finally, the court ordered Dickerson and Hendon to have no contact with Hopkins Airport unless they were there for a "lawful reason."

{¶11} Appellants now appeal from their conviction.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶12} Under the first and second assignments of error, appellants argue their convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Because the arguments are related, we address the first and second assignments of error together.

{¶13} When assessing a sufficiency-of-evidence claim, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether,

after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶14} A manifest-weight claim, on the other hand, requires the appellate court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶15} In Ohio, there are various acts that constitute the crime of criminal trespass. Relevant to the circumstances of this case, CCO 623.04(a)(4), which mirrors the language of R.C. 2911.21(A)(4),[1] provides, in part:

> (a) No person, without privilege to do so, shall do any of the following:
> * * *
> (4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant, or the agent or servant of either.

{¶16} "The offense of criminal trespass forbidden under R.C. 2911.21(A)(4) basically consists of failing to leave the premises once the actor is asked to leave; thus, if one remains on the premises once he [has been] requested to leave, the offense is complete." *State v. Kemp*, 2d Dist. Montgomery No. 13396, 1993 Ohio App. LEXIS 1828, * 3 (Mar. 29, 1993), *see also State v. Ferguson*, 1st Dist. Hamilton No. C-74216, 1975 Ohio App. LEXIS 7500, * 2 (Mar. 24, 1975). ("The act which the State was compelled to prove [under R.C. 2911.21(A)(4)] was the defendant-appellant's refusal to leave [the store] upon being notified to do so by an agent of the store."); 75 American Jurisprudence 2d, Trespass, Section 165 ("Unlawful remaining, as applied

to public buildings and surrounding property, requires that a trespasser refuse or ignore a contemporaneous order to leave. In other words, notwithstanding that when a property is open to the public at the time of an alleged trespass the accused is presumed to have a license to be present, a statute which provides that a person commits a criminal trespass when he or she knowingly and without authority remains upon the land or premises of another person after receiving notice from * * * an authorized representative of the owner or rightful occupant to depart applies with equal force to publicly owned property.").

{¶17} In challenging the sufficiency of the evidence supporting their convictions, appellants argue the prosecution failed to prove that (1) they negligently failed to leave or refused to leave the airport after being notified to do so, and/or (2) that they did not have the privilege to enter and remain on the public property. We disagree.

{¶18} After careful review of the record, we find the prosecution presented sufficient evidence to prove beyond a reasonable doubt that Dickerson and Hendon refused to leave the airport after being notified to do so by the Cleveland police. In this case, Officer DiMarco, an agent of the municipal property owner, testified that he and several other officers warned Dickerson and Hendon that they could not loiter in the airport and could be arrested for criminal trespass if they did not leave the property. As stated by Officer DiMarco, Dickerson was given several opportunities to leave the premises but refused to do so, stating, "Arrest me. Arrest me. I'm not leaving." Further, Officer DiMarco testified that Hendon was advised that he would have to leave the airport at that time or he would also be arrested. When asked if he was going to leave, Hendon responded, "No, [I'm] going to jail." Thus, the testimony presented at trial sufficiently established appellants' verbal and unambiguous refusals to leave.

---

[1] For the purposes of this appeal, references to R.C. 2911.21 apply equally to CCO 623.04.

**{¶19}** With respect to appellants' privilege argument, we note that "[t]he existence of a privilege in a given case is necessarily dependent upon the particular facts and circumstances of that case." *Dayton v. Moore*, 2d Dist. Montgomery No. 13369, 1993 Ohio App. LEXIS 1647, * 8 (Mar. 25,1993).

**{¶20}** "Privilege" is defined in R.C. 2901.01(L):

> Privilege means an immunity, license, or right conferred by law, or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity.

**{¶21}** As a general rule, a person has a privilege to enter and be upon the public areas of public property. *State v. Shelton*, 63 Ohio App.3d 137, 578 N.E.2d 473 (4th Dist.1989). However, the rule is not all encompassing, and a criminal trespass can be committed on public land under certain circumstances. *Id.,* citing *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). In fact, it is no defense in Ohio that a criminal trespass occurred on public property. R.C. 2911.21(B); CCO 623.04(b); *State v. Westfall*, 2d Dist. Darke No. 897, 1975 Ohio App. LEXIS 7692, * 7 (Feb. 10, 1975).

**{¶22}** Because "the status of land as public property cannot be a defense to a charge of trespass [pursuant to R.C. 2911.21(B)], * * * then, concomitantly, the public official or agency into whose charge the property is put can withdraw or revoke the privilege otherwise enjoyed by a member of the public." *Moore* at * 8. Thus, regardless of an individual's initial privilege to enter and be upon the public areas of public property, "the statute for criminal trespass states at R.C. 2911.21(A)(4) that an owner or agent may revoke consent to remain on the premises." *State v. Carr*, 3d Dist. Union No. 14-11-20, 2012-Ohio-1679, ¶ 24.

**{¶23}** Applying the foregoing to the circumstances of this case, we find that while the appellants had the privilege to enter the public airport for the purposes of using its restroom

facilities, that privilege was not indefinite and was revoked once the officers separately asked Dickerson and Hendon to leave the property. As discussed, once their privilege was revoked, the criminal trespass was completed at the moment Dickerson and Hendon refused to leave. *See Kemp*, 1993 Ohio App. LEXIS 1828, at * 3; *Ferguson,* 1975 Ohio App. LEXIS 7500, at * 2.

{¶24} Nevertheless, appellants further argue that the City was required to prove that the officer's had a reasonable basis to revoke their privilege to remain on the public property. Appellants rely on the North Carolina Court of Appeals decision in *State v. Marcoplos*, 154 N.C.App. 581, 572 S.E.2d 820 (2002), wherein the court held:

> If premises are open to the public, the occupants of those premises have the implied consent of the owner/lessee/possessor to be on the premises, and that consent can be revoked only upon some showing that the occupants have committed acts sufficient to render the implied consent void.

*Id.* at 582-583, citing *State v. Winston*, 45 N.C.App. 99, 102, 262 S.E.2d 331 (1980).

{¶25} In contrast to *Marcoplos*, however, courts have also construed similar versions of Ohio's "refuse to leave" criminal trespass statute as not requiring public or private property owners to provide a reason or basis for asking an individual to leave their property. *State v. Pentico*, 151 Idaho 906, 912, 265 P.3d 519 (Idaho App.2011) ("the statute does not distinguish between public and private property and does not require the owner or authorized agent of the owner of real property to identify (or even have) a reason to ask a person to leave."), citing *State v. Korsen*, 138 Idaho 706, 716, 69 P.3d 126 (2003), abrogated on other grounds ("By requiring proof of an adequate reason for asking someone to leave public property, the magistrate effectively created an additional statutory element to I.C. § 18-7008(8) that the law does not require."), *State v. Missamore*, 119 Idaho 27, 31, 803 P.2d 528 (1990), *State v. Bowman*, 124 Idaho 936, 945, 866 P.2d 193 (Idaho App.1993).

**{¶26}** In our view, a strict interpretation of R.C. 2911.21 reveals that there is nothing in the language of the statute that would require the state to prove the agent or owner's motivation or basis for revoking an individuals' "implied consent" to be on a specific property. *See State v. Gish*, 4th Dist. Athens No. 94 CA 1612, 1994 Ohio App. LEXIS 5562, * 3 (Dec. 1, 1994) ("R.C. 2911.21(A)(4) only requires that the alleged trespasser refuses to leave the premises when told to do so. * * * The record shows the defendants were asked to leave the premises and they refused. The property owner's motive in making the request is irrelevant."). Accordingly, we are unpersuaded by appellant's reliance on *Marcoplos*. Had the legislature intended there to be a heightened showing of proof under R.C. 2911.21(A)(4) for acts occurring on public property, it would have so specified and would not have incorporated R.C. 2911.21(B) into the criminal trespass statute. To hold otherwise, would require the prosecution to prove an element that is omitted from the indictment, or in this case, the criminal complaint.

**{¶27}** Moreover, while appellants only cite *Marcoplos* for the proposition that one's privilege can only be revoked "upon some showing that the occupants have committed acts sufficient to render the implied consent void," we find it necessary to note that the *Marcoplos* court went on to clarify that "one with lawful authority" may order a person to leave an area held open to the public "when that person no longer has a legitimate purpose for being upon the premises." *Id*. at 584-585. Thus, even if we were to adopt the holding set forth in *Marcoplos,* the outcome of this case would not be altered as the evidence presented at trial established that Dickerson and Hendon were only asked to leave the airport after they used the public restrooms and no longer had a "legitimate basis" to be in the baggage area of the airport.

**{¶28}** We emphasize that our holding does not stand for the proposition that a criminal trespass conviction will always be upheld once the general privilege to enter public property is

revoked and the defendant refuses to leave. For example, there are circumstances where a criminal trespass may be inappropriate where, subject to certain time, place, and manner of use restrictions, the defendant is lawfully exercising his or her First Amendment rights to free speech and peaceful assembly. However, the facts of this case do not support a finding that appellants were exercising a constitutional right at the time they were asked to leave the airport. Instead, Dickerson and Hendon were asked to leave following their confrontation with the police.

{¶29} Viewing the evidence in a light most favorable to the prosecution, a reasonable trier of fact could find the essential elements of CCO 623.04(a)(4) to be proven beyond a reasonable doubt. The record reflects that appellants were without privilege to remain on the premises once they finished using the restroom facilities and were notified to leave by an agent of the property owner. Further, Officer DiMarco's testimony was sufficient to show that they refused to leave. *See State v. Doe*, 9th Dist. Lorain Nos. 4130 and 4131, 1987 Ohio App. LEXIS 8088 (July 22, 1987). Accordingly, appellants' convictions are supported by sufficient evidence.

{¶30} Moreover, we are unable to conclude that the verdicts were against the manifest weight of the evidence. The trial court, as the trier of fact, was in the best position to weigh the credibility of the witnesses and was free to find Officer DiMarco's testimony to be more credible than the appellants'. Deferring to the trial court's assessment of the credibility of the witnesses, as we must, we cannot say that the trier of fact lost its way and performed a miscarriage of justice in convicting the appellants of criminal trespassing.

{¶31} Appellants' first and second assignments of error are overruled.

### B. Conditions of Community Control Sanctions

**{¶32}** In her third assignment of error, Dickerson argues the trial court abused its discretion in imposing as a condition of probation that she shall have no contact with Hopkins Airport unless she is there for a "lawful reason."

**{¶33}** R.C. 2929.25 governs misdemeanor community control sanctions and provides that the sentencing court shall require as a condition of any community control sanction that the offender abide by the law. Additionally, the court is permitted to impose "additional requirements" on the offender. *See* R.C. 2929.25(C)(2).

**{¶34}** Thus, pursuant to R.C. 2929.25, the trial court acted within its discretion in ordering Dickerson, as a condition of her community control sanctions, to have no contact with the airport except for a lawful purpose. Furthermore, we find no merit to Dickerson's assertion that the phrase "lawful purpose" is "overly broad." In our view, the language is unambiguous. Dickerson would violate the terms of her probation if she enters Hopkins Airport and subsequently engages in unlawful conduct, as defined under state or municipal statutes.

**{¶35}** Dickerson's third assignment of error is overruled.

### III. Conclusion

**{¶36}** The appellants' criminal trespassing convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Furthermore, the trial court did not abuse its discretion by ordering Dickerson to have no contact with Hopkins Airport except for a "lawful purpose."

**{¶37}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

MARY J. BOYLE, J., FRANK D. CELEBREZZE, JR., J., LARRY A. JONES, SR., A.J., and KATHLEEN ANN KEOUGH, J., CONCUR

TIM McCORMACK, J., CONCURS (WITH SEPARATE OPINION ATTACHED)

SEAN C. GALLAGHER, J., CONCURS IN JUDGMENT ONLY (WITH SEPARATE OPINION ATTACHED) and CONCURS WITH SEPARATE CONCURRING OPINION OF TIM McCORMACK, J.

MELODY J. STEWART, J., CONCURS IN JUDGMENT ONLY (WITH SEPARATE OPINION ATTACHED)

PATRICIA ANN BLACKMON, J., EILEEN A. GALLAGHER, J., and MARY EILEEN KILBANE, J., DISSENT (WITH SEPARATE OPINION ATTACHED)

ANITA LASTER MAYS, J., RECUSED

TIM McCORMACK, J., CONCURRING:

{¶38} This question arises from a dispute over the nature and usage of certain public property, as to the degree of control, rules, regulations, and restrictions that can appropriately be applied to property that is owned fully by the community. Thankfully while this dispute is not sourced from a traumatic altercation, still its subject matter is important nonetheless as a meaningful guide to clarifying and understanding both the rights and responsibilities of citizens entering and using public property.

{¶39} While public property in its many manifestations often proves invaluable to the pubic that enjoys its usage, public use and enjoyment of community property is naturally tempered by the necessity of establishing reasonable and related restrictions on when and how we utilize public assets.

{¶40} Public parks, libraries, swimming pools, skating rinks, and athletic fields each provide wholesome outlets for the community. The attractions are open to the public and often without charge. They also, though, have restrictions in place in order to ensure public safety and convenience: hours of operation, pet policy, protection of natural settings, water conservation, sound levels, traffic control, prohibitions on contraband. These public lands exist for the benefit of the public, but the public is not invited to unbridled usage of the property owing to the fact that they are a community not a private asset. That essential balance especially applies to the many sensitive challenges that a major public airport faces each day.

{¶41} Public airport property is foremost dedicated to, and legally mandated to, safely and conveniently serve the traveling public. Major public urban airports impact many square miles of surrounding infrastructure in order to move the public to and through its terminals in a safe, sanitary, and convenient manner. Approaching major interstate highways are clearly marked with signage and instructions to lead to airport lanes. Dedicated airport acres are filled with access roads to ensure approaching and departing safety and convenience. Once located on grounds, walkways, escalators, elevators, ticketing, baggage claims, and retail store signage are omnipresent in order to best ensure safe, orderly, and convenient movement of people to their airport destinations. Public airport management and airport law enforcement have a legally mandated duty to ensure that the traveling public will experience airport grounds that are fully dedicated to its unique purpose, i.e., moving the air-traveling public safely, conveniently, and

sanitarily in and out of its airport. While all persons who are legally utilizing airport grounds are entitled to its public spaces, no member of the public conversely possesses the cover of legal protection to misuse the dedicated facility and thereby frustrate the necessary provision of airport service to the traveling public. Those who would misuse airport property for non-traveling purposes are not exempted from legal consequences because they choose to use public property inappropriately in an unauthorized manner. A proper balance of fundamental interests on airport grounds is not only legally supportable but as a matter of public policy, it is in the best interests of the community.

SEAN C. GALLAGHER, J., CONCURRING IN JUDGMENT ONLY:

{¶42} I concur in judgment only with the opinion of the majority. I respectfully disagree with the determination by the majority in paragraph 23 that the appellants maintained their privilege to use the airport restroom facilities within the meaning of R.C. 2901.01(L).

{¶43} If this case stands for anything, it likely demonstrates how we have failed to address issues of homelessness in our society. This failure brings us to an unnecessary discussion of privilege. Although I am certainly not suggesting that a member of the public can be denied use of a public restroom in an open-to-public facility, I would stop short of conferring an absolute privilege on that person where the person's presence is not related to the purpose of the facility.

{¶44} I would describe appellants' status as having an implied consent or, under certain circumstances, a limited privilege to use the public facility, but stop short of conferring an absolute privilege upon the defendants in this case. The limited privilege remains "as long as that privilege, based upon implied consent, is within the conditional or restricted consent of the

owner to enter." *State v. Girardier*, Mo.App. No. ED102764, 2015 Mo. App. LEXIS 1255, at *16 (Dec. 8, 2015). Evidence, however, of the stay being prolonged or for a reason unrelated to the nature of the facility, boisterous conduct, breach of the peace, interference with others' reasonable use of the facility, picketing, or other conduct that would revoke the implied consent of the owner by acts inconsistent with the purposes of the business or facility demonstrates the limited nature of the privilege bestowed upon the public. *Id.*

{¶45} Appellants were not there to use the airport for its intended purpose, nor were they even there to watch airplanes or pick anyone up. Thus, they had not availed themselves of the limited privilege conferred upon entrants to the public facility. Had their presence been connected to any reasonable or rational use of the airport, the limited privilege would arise. Here, it did not; therefore, I concur in judgment only.

MELODY J. STEWART, J., CONCURRING IN JUDGMENT ONLY:

{¶46} I agree with the dissent that there is no evidence indicating that Dickerson and Hendon were doing anything unlawful in the airport when Dickerson was approached by the officer and that his initial actions were based on the mistaken belief that Hendon was not using the restroom facilities as his mother, Dickerson, stated. This means that they could not have been lawfully arrested at this point: and they were not. However, when the officers concluded, based on the appellants' responses to them and their prior history with the appellants at the airport, that they had no other legitimate or permissive reasons to remain in the airport, they were authorized to ask the appellants to leave. The history of the appellants at the airport was obviously key to the trial court's decision. And although I agree in principle with the sentiment

of the dissent, I cannot conclude that the trial court's finding was not rationally based on the evidence.

PATRICIA ANN BLACKMON, J., EILEEN A. GALLAGHER, J., and MARY EILEEN KILBANE, J., DISSENTING:

{¶47} We respectfully dissent. We would find the city did not prove, beyond a reasonable doubt, that Hendon and Dickerson were at the airport, without privilege, which was open to the public at the time of their arrest. It appears from the record that the initial officer's actions were based on his mistaken belief that Hendon was not in the restroom as Dickerson had told the officer, leading to the compounded mistake that she was lying to him, and ultimately ending in their arrests.

{¶48} According to Dickerson, Officer Harper approached her while she was waiting outside the men's restroom for Hendon. She explained that she was waiting for her son while he used the restroom. Mother wanted to be near her 19-year-old son because he was feeling ill. Officer Harper did a cursory look in the men's restroom and did not see Hendon, so he returned to Mother. He told Mother that no one was in the restroom. This was the beginning of the misunderstanding.

{¶49} Officer Harper told Dickerson that she could not loiter at the airport. Dickerson replied that "she wasn't loitering[,] * * * she was waiting on her son[.]" The two of them "went back and forth about [Hendon] being in the restroom." Dickerson testified, "[f]or me, it was unbelievable for [Harper] to go back and forth, when he didn't check the restroom, and I knew [Hendon] was in there." Officer Harper continued to inquire. Dickerson then asked for his name and badge number because she wanted to file a complaint.

{¶50} At this point, Officer DiMarco, who was the only witness to testify on behalf of the city, approached and joined in the conversation. He noted that while Mother was speaking with Officer Harper, she did not interfere with any passengers obtaining their luggage, cause a delay, or harass anyone. Based on the conversation between Officer Harper and Dickerson, Officer DiMarco decided to personally look in the restroom to determine if Hendon was actually using the restroom. Officer DiMarco testified that he almost walked into Hendon as Hendon was exiting the restroom. Clearly, Hendon had in fact been using the restroom.

{¶51} Officer DiMarco and Hendon then joined Officer Harper and Dickerson outside the restroom. When Hendon came out of the restroom, Mother testified that "everything began to collapse because [Sergeant DeJesus and Officer DiMarco] were believing [Officer Harper] * * * as if I wasn't * * * truthful." Mother further testified that she was never told to leave. The only discussion she had with the officers was "that [her] son wasn't in the restroom." Hendon testified that the officers never told them that they had to leave, but Officer DiMarco told them that they could not loiter at the airport.

{¶52} Officer DiMarco testified that they told Dickerson and Hendon that they had to leave the airport and they could not loiter there. The officers advised Hendon that he would have to leave or be arrested. Hendon did not get a chance to respond to the officers. Instead, Dickerson, directing her remark to Hendon said, "[y]ou're going to jail with me." Officer DiMarco then asked him if he was leaving. Hendon replied that he was not leaving, "he was going to jail."

{¶53} Hendon and Dickerson both argue that the city failed to prove loss of privilege because they did not cause a disturbance or engage in conduct to justify the revocation. They

maintain that Hendon was lawfully using the public restroom, and Dickerson was waiting quietly at the time they were approached by the officers.

**{¶54}** As this court stated in *State v. Casey*, 8th Dist. Cuyahoga No. 99742, 2014-Ohio-1229, *discretionary appeal not allowed*, 140 Ohio St.3d 1415, 2014-Ohio-3785, 15 N.E.3d 884, "[t]he state bears the burden of proving the lack of privilege." *Id.* at ¶ 16, citing *State v. Newell*, 93 Ohio App.3d 609, 611, 639 N.E.2d 513 (1st Dist.1994). *See also Euclid v. Moore*, 8th Dist. Cuyahoga No. 75143, 1999 Ohio App. LEXIS 5900, *16 (Dec. 9, 1999) (where this court stated "[t]he prosecution is also required to show beyond a reasonable doubt that defendant did knowingly remain on the land or premises of another and was not privileged to be there." *Id.*, citing *Mariemont v. Wells*, 33 Ohio Misc.2d 9, 10, 514 N.E.2d 764 (Hamilton Cty. 1986)); and *Beachwood v. Cohen*, 29 Ohio App.3d 226, 504 N.E.2d 1186 (8th Dist.1986) (defendant-appellant's conviction for criminal trespass was reversed where the city "introduced no evidence to show that appellant was without privilege to be on the property" on the date of the incident as required by city ordinance. *Id.* at 232.).

**{¶55}** In *Casey*, the defendant/ex-boyfriend broke through the door of the victim's house and shoved her on the couch. *Id.* at ¶ 3. The defendant previously possessed a key to the victim's property and stored some of his personal belongings there. The victim, however, demanded the return of the keys two weeks prior to the incident. *Id.* at ¶ 5. The court found the defendant guilty of aggravated burglary in violation of R.C. 2911.11(A)(1), noting that the victim had sole custody and control of the apartment because her name was on the lease, she alone paid the rent, and she revoked any privilege the defendant may have had when she demanded the return of the keys two weeks before the incident occurred. *Id.* at ¶ 20.

**{¶56}** On appeal, we affirmed defendant's criminal trespass conviction. We noted that in a sufficiency challenge, every element of an offense must be proven beyond a reasonable doubt. *Id.* at ¶ 12. In discussing the elements of criminal trespass, we stated:

> [p]er R.C. 2911.10, the element of "trespass" refers to a violation of R.C. 2911.21 of the _Revised Code. R.C. 2911.21, which governs criminal trespass, states, in relevant part, that "[n]o person, *without privilege to do so*, shall * * * [k]nowingly enter or remain on the land or premises of another. (Emphasis added.)

*Id.* at ¶ 14.

**{¶57}** We further stated that

> [p]rivilege is the distinguishing characteristic between unlawful trespass and lawful presence on the land or premises of another. R.C. 2901.01(A)(12) defines "privilege" as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." "Where no privilege exists, entry constitutes trespass." *State v. Lyons*, 18 Ohio St.3d 204, 206, 480 N.E.2d 767 (1985).

*Id.* at ¶ 16.

**{¶58}** Because Dickerson and Hendon have brought forth a sufficiency challenge, the city bears the burden of proving, beyond a reasonable doubt, that they lost their privilege to be on public property (the airport) in order to sustain the convictions for criminal trespass. *Casey* at ¶ 16. Here, the majority concedes that Hendon and Dickerson had privilege to use the public restrooms at the airport, but conclude the privilege was revoked when the officers asked them to leave. However, Officer DiMarco, as the only witness for the city, was never asked or volunteered any testimony about how Hendon or Dickerson lost their privilege to use a public restroom.

**{¶59}** Instead, the testimony demonstrates that Dickerson was waiting for Hendon outside of the public men's restroom when she was approached by Officer Harper. Hendon used the restroom while the airport was open to the public during normal business hours, because there is

no testimony indicating that the airport was closed at the time. There also was no evidence of any signs restricting access to the public restroom, and no special key was needed to access the restroom.

{¶60} The city never questioned its only witness, Officer DiMarco, about Hendon's or Dickerson's privilege to be at the airport or how Hendon or Dickerson allegedly lost their privilege at the time of the incident. The majority of Officer DiMarco's testimony, which was elicited by the city, described his past interactions with Hendon and Dickerson, and confirmed that Dickerson was in fact waiting for her son while he used the public restroom. There was no testimony by Officer DiMarco as to how Hendon or Dickerson lost their privilege to be at the airport and on public property on the day in question.

{¶61} Dickerson's and Hendon's testimony is consistent and clear that Hendon was using the public restroom, without causing a disturbance, while the exchange with Dickerson, Officer Harper, and Officer DiMarco occurred. Hendon was lawfully using the public restroom at the time Officer Harper and then Officer DiMarco approached Dickerson. Officer Harper's initial actions were based on the mistaken belief that Hendon was not in the restroom as Dickerson stated, leading him to mistakenly believe that Dickerson was lying to him. This misunderstanding resulted in the arrest of Dickerson and, ultimately, Hendon's arrest.

{¶62} Unlike in *Casey*, *Moore*, and *Cohen*, in the instant case, the city introduced no evidence establishing that Dickerson and Hendon had lost their privilege to be at the airport using the public restroom. Moreover, there is no evidence to establish that they were doing anything unlawful at the time of the incident, such as interfering in the airport's operation or security. Dickerson was simply waiting for Hendon while he used the public restroom at Cleveland Hopkins International Airport, a facility that was open to the public at the time. Rather, the

record demonstrates that Dickerson and Hendon were arrested after Sergeant DeJesus instructed Officer Marino to do so. The record is devoid of any reason why Dickerson could no longer wait for her ill son, who was using the restroom.

{¶63} Based on the foregoing, and after viewing the evidence in a light most favorable to the prosecution, we cannot say that the city established that Dickerson and Hendon were at the airport without privilege. Thus, Dickerson's and Hendon's convictions for criminal trespass are not supported by the sufficiency of the evidence. *See State v. Hooper*, 5th Dist. Delaware No. 13CAC010006, 2013-Ohio-4898, ¶ 24 (where the court found insufficient evidence to support defendant's criminal trespass conviction when there was no evidence that defendant did not have a privilege or right to enter onto the premises. There were no signs restricting public access, and the business property appeared open to the public during normal business hours.).

{¶64} Therefore, we would sustain the first assignment of error.

{¶65} In their second assignment of error, Hendon and Dickerson both claim that their convictions are against the manifest weight of the evidence. They contend the trial court "lost its way" in convicting them of criminal trespass in light of the evidence that they were privileged to be at the airport and the police wrongfully revoked their privilege. In Dickerson's third assignment of error, she claims that the trial court abused its discretion imposing the no contact order because the court did not specify what constitutes a lawful reason.

{¶66} Based on how we would resolve the first assignment of error, however, we would find the second assignment of error and Dickerson's third assignment of error moot. App.R. 12(A)(1)(c).

{¶67} Accordingly, we would reverse and remand the matters to the trial court with instructions to vacate Hendon's and Dickerson's criminal trespassing convictions.